**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
GLAXOSMITHKLINE BIOLOGICALS, S.A., :
: Case No. 1:13-cv-04346
Plaintiff, :
: Judge John W. Darrah
v. :
: ECF Case
HOSPIRA WORLDWIDE, INC. and :
HOSPIRA, INC., :
:
Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**FIRST AMENDED COMPLAINT**

Plaintiff GlaxoSmithKline Biologicals, S.A. ("GSK"), by its undersigned attorneys, for its complaint against Defendants Hospira Worldwide, Inc. and Hospira, Inc. (together, "Hospira"), alleges as follows:

**Introduction**

1. This action arises from Hospira's material breaches and unilateral termination of a Toll Manufacturing Agreement ("Agreement"), dated as of December 31, 2010, entered into by GSK and Hospira, for the production and manufacture of an influenza vaccine product ("Vaccine Product"), which was to be sold and distributed across the United States. *See* Toll Manufacturing Agreement attached hereto as Ex. A. The Agreement encompassed and incorporated various schedules, some of which were themselves individually executed contracts between the parties. These schedules were incorporated in and formed a part of the overall Agreement between the parties. *See, e.g.*, *id.* at Schedules 1-10; Ex. B; Ex. C.

2. Under the Agreement, Hospira agreed to manufacture a Vaccine Product that would be in compliance with the contract's quality requirements, in accordance with current

good manufacturing practices ("cGMP"), appropriate for regulatory submission by the end of 2011, and "otherwise acceptable to GSK at its sole discretion." *See, e.g.*, Ex. A, §§ 3, 4, 6, 24; Schedules 3, 5, 7. Hospira also agreed to manufacture validation batches of the Vaccine Product ("Validation Batches") according to the Agreement's quality standards and to maintain its facility in McPherson, Kansas in compliance with cGMP to ensure that Hospira fulfilled its obligations under the Agreement. *See, e.g.*, *id.*, §§ 3, 4, 6; Schedules 5, 7.

3. Hospira failed to meet any of these obligations. The Validation Batches and Vaccine Product produced by Hospira at its facility in McPherson, Kansas (far behind schedule) contained numerous quality problems, were not in accordance with cGMP, were not appropriate for regulatory submission, and were not acceptable to GSK. The McPherson facility also suffered from critical deficiencies and was not in compliance with cGMP. GSK frequently notified Hospira of its failures to perform under the Agreement and, on multiple occasions, Hospira itself issued written declarations acknowledging its failures to perform under the contract.

4. In the face of Hospira's repeated failures, GSK also attempted to work with Hospira to help Hospira come into compliance with its contractual obligations. GSK extended deadlines and was open to considering new specifications for the Vaccine Product once it became apparent that Hospira would be unable to produce an acceptable product based on earlier specifications. For example, although the parties initially contemplated that a trivalent ("TIV") version of the Vaccine Product would be used, Hospira breached the Agreement by failing both to satisfy the project's validation requirements and timely produce a Vaccine Product that was acceptable to GSK, in accordance with cGMP, and appropriate for regulatory submission, as required by the Agreement. Without any waiver, GSK therefore agreed to work with Hospira to

2

launch a quadrivalent ("QIV") version of the product that would satisfy Hospira's contractual obligation to deliver an acceptable Vaccine Product. But despite GSK's flexibility and efforts to help Hospira comply with its obligations and salvage the project, Hospira was never able to meet its contractual obligations. It breached and failed to perform as to the QIV version as well.

5. The definition of the "Vaccine Product" under the Agreement draws no distinction between the TIV and QIV versions. Under Section 1.47, Vaccine Product "means the GSK influenza vaccine product which includes the Bulk, [*i.e.* raw materials] filled and finished by Hospira." *Id.* at § 1.47. In accepting this definition, Hospira agreed that the Vaccine Product it bound itself to produce could change over the five-year term of the Agreement in order for Hospira to produce a Vaccine Product acceptable to GSK and in accordance with the Agreement's quality standards. The Agreement therefore encompasses Hospira's production of both the TIV and QIV versions and required Hospira to deliver a Vaccine Product, whether TIV or QIV, that was acceptable to GSK, in accordance with cGMP, and appropriate for regulatory submission. Instead of meeting its obligations, Hospira breached and failed to perform as to TIV and then breached and failed to perform as to QIV.

6. On March 22, 2012, after repeatedly and continuously failing to perform under the Agreement, Hospira simply gave up. On that day, Hospira informed GSK that Hospira was unilaterally terminating the contract, more than three years before the end of the Agreement's term in December 2015. Hospira confirmed its unilateral termination in writing and subsequent conversations.

7. At the time that Hospira unilaterally terminated and breached the Agreement, Hospira had failed to deliver a Vaccine Product acceptable to GSK or produce a product in compliance with the contract's quality requirements and in accordance with cGMP. Hospira also

had failed to meet the contract's project deadlines and deliver a product ready for regulatory submission by year-end 2011.

8. Hospira's unilateral termination of and failure to perform under the Agreement constitute separate and independent breaches of the contract. At no point did GSK "waive" its rights against Hospira under the Agreement, as Hospira contends. [DKT #49 at 9]. GSK certainly did not "waive" any rights by agreeing to work with Hospira on a QIV version of the Vaccine Product after Hospira had breached and failed to perform as to TIV. To the contrary, GSK explicitly reserved any rights by virtue of Section 29 of the Agreement, which states that "[n]o waiver shall be effective unless in writing and signed by the waiving Party." Ex. A at § 29. GSK additionally reserved its rights against Hospira by consistently notifying Hospira of its performance failures under the Agreement.

9. Hospira's actions in this case are not isolated events. Since 2010, the FDA has issued four warning letters and thirteen 483 reports to Hospira for failing to comply with cGMP and failing to address other quality and compliance issues. In 2012, Hospira's McPherson facility alone received two 483 reports from the FDA, dated January and October 2012. The January 2012 report, which presented the FDA's results of an inspection between November 2011 and January 2012, discovered numerous quality issues at McPherson and found that the facility had failed to establish laboratory controls and procedures necessary to ensure compliance with relevant safety standards. In particular, the January 2012 report observed that: (i) "[p]rocedures designed to prevent microbiological contamination of drug products purporting to be sterile are not established;" (ii) "[t]here are no written procedures for production and process controls designed to assure that the drug products have the identity, strength, quality, and purity they purport or are represented to possess;" (iii) "[l]aboratory controls do not include the

establishment of scientifically sound and appropriate specifications and test procedures designed to assure that drug products conform to appropriate standards of identity, strength, quality and purity;" and (iv) "[t]est devices are deficient in that instruments, apparatus, gauges, and recording devices not meeting established specifications are used." Federal regulators have additionally forced Hospira to issue recalls of its products, and multiple newspapers have recently reported that Hospira faces systemic problems at its manufacturing facilities. Even one of Hospira's own executives acknowledged that the company had become "a little lazy" and was "skating behind the puck." As the FDA reports and Hospira's own comments reveal, Hospira faces critical quality problems in its manufacturing processes.

10. Prior to Hospira's unilateral termination of the Agreement, GSK had, in reliance on Hospira's contractual promises, devoted over a year's worth of time and tens of millions of dollars in resources in order to perform under the contract.

11. Despite numerous efforts to salvage the Agreement and mitigate its losses, GSK has now sustained substantial damages in excess of $25 million as a direct and proximate cause of Hospira's material breaches and unilateral termination.

### Parties

12. GlaxoSmithKline Biologicals, S.A. is a foreign corporation, organized and existing under the laws of Belgium, with its principal place of business in Rixensart, Belgium. GSK is a global healthcare company that researches and develops innovative vaccines for distribution around the world.

13. Defendant Hospira Worldwide, Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business in Lake Forest, Illinois. Hospira Worldwide, Inc. is a party to, and breached its obligations under, the contract at issue in this case. Hospira Worldwide, Inc. is a wholly-owned subsidiary of Hospira, Inc.

14. Defendant Hospira, Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business in Lake Forest, Illinois. Hospira, Inc. is a worldwide provider of injectable drugs, infusion technologies, and other pharmaceutical products. Hospira, Inc. is a party to the Agreement, and breached its obligations under it, because it individually executed Schedules 5 and 7, which were attached to, and form a part of, the overall Agreement at issue in this case. *See* Ex. B at 2; Ex. C at 1. Hospira, Inc.'s execution of these schedules also manifests its intent to be bound by the Agreement. Moreover, Hospira, Inc. employees participated in and controlled contract negotiations and signed the Agreement, which evidence additional intent to be bound by Hospira, Inc.

## Jurisdiction and Venue

15. This Court has original jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity between the parties and because the amount in controversy exceeds $75,000, exclusive of interest and costs.

16. This Court has personal jurisdiction over Hospira Worldwide, Inc. and Hospira, Inc. pursuant to 735 ILCS 5/2-209. Hospira Worldwide, Inc. and Hospira, Inc. are headquartered in the State of Illinois and have regularly transacted and done business in this District.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because defendants are corporations subject to personal jurisdiction in this District, and, therefore, are deemed residents of this District pursuant to 28 U.S.C. § 1391(c). Venue is also proper in this District pursuant to Judge Castel's order of May 21, 2013 granting transfer of this case from the Southern District of New York to this District. [DKT #23].

**Facts**

Hospira's Obligations under the Agreement

18. GSK and Hospira entered into the Agreement, dated as of December 31, 2010, for the production and manufacture of an influenza vaccine product, which was to be sold and distributed across the United States. The Agreement encompassed certain schedules, some of which were themselves individually executed contracts between the parties, which formed a part of the overall Agreement between the parties.

19. The Agreement was not a mere "framework document" as Hospira contends. [DKT #49 at 1]. Rather, it created binding commitments between the parties and included terms on the subject matter and work to be performed (*see, e.g.*, Ex. A at §§ 3, 4, 5, 6, 8, 9, 12, 13, 14, 15, 16, 18, 21, 24), price and payment terms (*see, e.g.*, *id.* at §§ 10, 11; Schedule 2), quantity (*see, e.g.*, *id.* at §§ 8, 9; Schedule 1), and duration (*see, e.g.*, at § 27; Schedule 3).

20. Pursuant to Section 8 of the Agreement, GSK supplied Hospira with the raw materials for the production of the Vaccine Product. *See id.* at § 8.

21. Under Sections 3 and 6 of the Agreement, Hospira agreed to use the raw materials supplied by GSK to produce batches of the Vaccine Product in compliance with the Agreement's quality requirements and "otherwise acceptable to GSK at its sole discretion." *See id.* at §§ 3, 6.

22. Under the Section 6 of the Agreement, Hospira also agreed to manufacture the "Vaccine Product . . . in accordance with the Terms of this Agreement, Good Manufacturing Practice, . . . [and] the Quality Agreement [which was an individually executed contract attached as Schedule 7 to the Agreement]." *Id.* at § 6.

23. Under Section 1.47 of the Agreement, Vaccine Product "means the GSK influenza vaccine product which includes the Bulk, [*i.e.* raw materials] filled and finished by Hospira." *Id.* at § 1.47. The definition of the "Vaccine Product" under the Agreement therefore

7

draws no distinction between the TIV and QIV versions. In accepting this definition, Hospira agreed that the specifications of the Vaccine Product it bound itself to produce could change over the five-year term of the Agreement in order for Hospira to produce a Vaccine Product acceptable to GSK and in accordance with the Agreement's quality standards. The Agreement thus encompasses production of both the TIV and QIV versions and requires Hospira to deliver a Vaccine Product, whether TIV or QIV, that is acceptable to GSK, in accordance with cGMP, and appropriate for regulatory submission.

24. Under Section 4 of the Agreement, Hospira agreed to "provide and maintain the Manufacturing Site [Hospira's McPherson facility] in compliance with cGMP and Applicable Laws . . . necessary to enable Hospira to fulfill all its obligations under this Agreement . . . ." *Id.* at § 4.

25. The parties additionally agreed to a clear timetable for project deadlines. According to Schedule 3 of the Agreement, Hospira agreed that all Validation Batches would be ready for regulatory filing in 2011. *See id.* at Schedule 3.

26. On September 15, 2011, Hospira and GSK executed the Quality Agreement (incorporated into the Agreement as Schedule 7), which sets out detailed procedures and technical information for production under the Agreement. In particular, Section 22 of the Quality Agreement provides:

> Hospira shall conduct and maintain all [validation] necessary to ensure processes, facilities and systems used for the Product manufacturing meet the requirements of GMP, [regulatory requirements] and the PTS [Product Transfer Specification]. This includes, but is not limited to, manufacturing processes, cleaning and sanitisation, GMP related computer systems, critical facilities . . . and test methods. Ex. C at § 22.

Section 15 of the Quality Agreement additionally obligates Hospira to manufacture the Product "in strict accordance with cGMP and [regulatory requirements] . . . ." *Id.* at § 15.

8

Hospira's Failure to Perform under the Agreement

27. Hospira never met its obligations under Section 6 of the Agreement to produce Validation Batches or a Vaccine Product (either TIV or QIV versions) acceptable to GSK or to produce a Vaccine Product in compliance with the Agreement's quality requirements, in accordance with cGMP, and appropriate for regulatory submission by the end of 2011.

28. Rather, in breach of Sections 3, 6, 24, and Schedule 3 of the Agreement, Sections 15 and 22 of the Quality Agreement, and the Agreement's additional provisions on quality requirements, the Validation Batches and Vaccine Product produced by Hospira contained numerous quality problems, were not in accordance with cGMP, and were never ready for regulatory submission. Hospira's product, *inter alia*, contained unacceptable inconsistencies, was adulterated with silicone, did not adequately mitigate against contamination risks, had invalid cleaning runs suffering from critical deviations, and generally failed to satisfy the Agreement's validation and other quality requirements.

29. Hospira also failed to meet the Agreement's project deadlines. Under Section 3 of the Agreement, Hospira agreed to submit to GSK a product ready for regulatory filing by 2011. *See* Ex. A at § 3; Schedule 3. To date, however, Hospira has failed to do so.

30. Hospira additionally breached its obligations to maintain the McPherson site in compliance with cGMP as required by Section 4 of the Agreement. As documented in GSK's October 2011 audit of the McPherson facility, Hospira's manufacturing site suffered from major deficiencies that precluded Hospira from fulfilling its obligations under the Agreement. The audit report found, *inter alia*, that Hospira's validation process was incomplete and insufficient, that Hospira's monitoring failed adequately to mitigate against contamination risks, that Hospira

had not met appropriate quality standards, and that the site was "<u>NOT APPROVED</u>" and "not considered to be on track to achieve file submission in December 2011."

31. Hospira's failures to perform under the Agreement are well documented. Hospira itself has drafted and signed written declarations admitting to its failures to perform. On November 30, 2011, for example, Hospira admitted that its validation results were "invalid" and "not acceptable for commercial use." On December 6, 2011, Hospira again admitted that its validation results were "invalid." Even as late as February 23, 2012, Hospira admitted that its product was fraught with "errors" and "unacceptable for GSK."

32. GSK consistently notified Hospira of its failures to perform under the Agreement. On September 7, 2011, for example, GSK informed Hospira that it had failed to produce successful Validation Batches acceptable to GSK as required by the Agreement. Moreover, as noted above, in October 2011, GSK conducted and distributed to Hospira an audit report detailing Hospira's production failures under the Agreement.

33. GSK additionally provided notice to Hospira of its failures to perform in written memoranda signed by Hospira in November 2011, December 2011, and February 2012. GSK also held weekly meetings with Hospira to discuss project status and consistently informed Hospira at these meetings that it had failed to meet its obligations.

34. While GSK consistently notified Hospira of its failures to perform under the Agreement, GSK also went to great lengths to work with Hospira to try to help Hospira produce acceptable Validation Batches and a Vaccine Product ready for regulatory submission and commercialization. In an October 28, 2011 meeting, for example, GSK addressed a number of Hospira's major quality failures and developed remediation and mitigation strategies to try to put the project back on course. On March 16 and March 17, 2012, GSK circulated to Hospira a

proposed plan for product development in the hopes that Hospira could complete successful Validation Batches and submit an acceptable Vaccine Product for regulatory filing by October 2012.

35. Hospira, however, continued to fail to perform under the Agreement and at no point met its obligations to produce a Vaccine Product (either TIV or QIV) or Validation Batches in accordance with the terms of the Agreement.

<u>Hospira's Unilateral Termination of the Agreement</u>

36. On March 22, 2012, more than three years before the end of the Agreement's term in December 2015, Hospira notified GSK that it intended to terminate the Agreement. Hospira's decision to terminate the Agreement was confirmed by an email from Hospira later that day and subsequently by a conversation between the parties on March 30, 2012.

37. On April 2, 2012, GSK informed Hospira in writing that its decision to terminate the Agreement constituted a material breach of the contract.

38. On April 4, 2012, Hospira acknowledged by email to GSK that Hospira considered the Agreement terminated.

39. To date, Hospira has failed to remedy its breach.

### First Cause of Action
### (Breach of Contract)

40. GSK repeats and realleges each and every allegation set forth in above.

41. The Agreement is a valid and enforceable contract between GSK and Hospira, made for valid consideration, and governed by the laws of the State of New York. The Agreement encompasses Hospira's production of both the TIV and QIV versions of the Vaccine Product.

42. GSK has in good faith performed its obligations under the Agreement.

43. Hospira has failed to perform and materially breached its obligations under the Agreement in all of the following ways:

   (a) failing to produce Vaccine Batches and a Vaccine Product (either the TIV or QIV version) in compliance with the Agreement's quality requirements;

   (b) failing to produce Vaccine Batches and a Vaccine Product (either the TIV or QIV version) in accordance with current good manufacturing practices ("cGMP");

   (c) failing to produce Vaccine Batches and a Vaccine Product (either the TIV or QIV version) appropriate for regulatory submission by the end of 2011;

   (d) failing to produce Vaccine Batches and a Vaccine Product (either the TIV or QIV version) otherwise acceptable to GSK;

   (e) failing to maintain the McPherson facility in accordance with cGMP;

   (f) failing to cure or remedy any of the breaches set forth above; and

   (g) unilaterally terminating the Agreement on March 22, 2012.

44. Each and every one of the foregoing breaches constitutes an independent material breach of the Agreement in violation of *inter alia* Sections 3, 4, 6, 24, 27, Schedule 3, Schedule 5, and Schedule 7 of the Agreement.

45. As a direct and proximate result of Hospira's material breaches under the Agreement, GSK has been sustained damages in an amount in excess of $25 million.

46. By virtue of the foregoing, GSK is entitled to recover (a) money damages against Hospira equal to GSK's losses in an amount exceeding $25 million; (b) interest on its damages claim; and (c) costs, expenses, and attorney's fees, pursuant to Sections 1.27 and 24.9 of the Agreement.

**Second Cause of Action**
**(Promissory Estoppel)**

47. In the event that the Court finds that there is no enforceable agreement between

12

the parties (as to either TIV, QIV or both), GSK pleads the following allegations in the alternative.

48. Hospira promised to produce a vaccine product in accordance with industry standards which GSK could submit to regulatory authorities and market in the U.S.

49. Hospira made this promise to GSK with the expectation that GSK would rely upon this promise.

50. GSK reasonably and foreseeably relied upon Hospira's promise to produce a vaccine product which GSK could submit to regulatory authorities and market in the U.S.

51. Because of its reliance on Hospira's promise, GSK spent nearly a year and a half working with Hospira on the project and did not contract with any other parties to produce a vaccine product. GSK performed its services in good faith and gave Hospira, without charge, raw materials worth tens of millions of dollars so that Hospira could manufacture a vaccine product which GSK could submit to regulatory authorities and market in the U.S. For nearly a year and a half, Hospira accepted these services, materials, and equipment.

52. As a direct and proximate result of Hospira's promise to accept GSK's offer, GSK suffered damages including, but not limited to, costs incurred on the raw materials provided to Hospira for the vaccine product, components for the vaccine product, capital expenditures, and production equipment.

53. Permitting Hospira to avoid its obligations to perform would unjustly enrich Hospira and unfairly prejudice GSK.

54. By virtue of the foregoing, GSK is entitled to recover (a) money damages against Hospira equal to GSK's losses in an amount exceeding $25 million; (b) interest on its damages claim; and (c) costs, expenses, and attorney's fees.

## Third Cause of Action
### (Quantum Meruit and Unjust Enrichment)

55. In the event that the Court finds that there is no enforceable agreement between the parties (as to either TIV, QIV or both), GSK pleads the following allegations in the alternative.

56. GSK performed its services in good faith and gave Hospira, without charge, raw materials worth tens of millions of dollars so that Hospira could manufacture a vaccine product which GSK could submit to regulatory authorities and market in the U.S.

57. GSK additionally spent nearly a year and a half working with Hospira to try to manufacture the vaccine product.

58. For nearly a year and a half, Hospira accepted these services, materials, and equipment.

59. In consideration for these services, materials, and equipment, GSK expected Hospira to produce a vaccine product which GSK could submit to regulatory authorities and market in the U.S.

60. To date, Hospira has failed to deliver to GSK a vaccine product in accordance with industry standards which GSK can submit to regulatory authorities or market in the U.S.

61. Hospira has therefore been enriched and received benefits at GSK's expense.

62. By virtue of the foregoing, GSK is entitled to recover a reasonable value of its services which amount to (a) money damages against Hospira equal to GSK's losses in an amount exceeding $25 million; (b) interest on its damages claim; and (c) costs, expenses, and attorney's fees.

63. Equity and good conscience require restitution for GSK and militate against permitting Hospira to retain what GSK seeks to recover.

**Reservation of Rights**

64.     GSK reserves the right to amend this Complaint.

**Prayer for Relief**

**WHEREFORE**, Plaintiff GSK respectfully requests that the Court award GSK money damages in an amount equal to GSK's losses; award GSK all interest as provided by law, including prejudgment interest; award GSK its attorneys' fees, disbursements and costs; and award GSK such other and further relief as this Court shall deem just and proper.

Dated: November 27, 2013

                                   Respectfully submitted,

                                   GLAXOSMITHKLINE BIOLOGICALS, S.A.

                                   By: /s/ Jennifer L. Ilkka

Jennifer L. Ilkka, Esq.
Timothy R. Carraher, Esq.
REED SMITH, LLP
10 South Wacker Drive
Chicago, Illinois 60606
(312) 207-1000

Jyotin Hamid, Esq. (admitted *pro hac vice*)
Benjamin M. Aronson, Esq. (admitted *pro hac vice*)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-1031

*Attorneys for Plaintiff*
*GlaxoSmithKline Biologicals, S.A.*

**CERTIFICATE OF SERVICE**

The undersigned, an attorney for Plaintiff GlaxoSmithKline Biologicals, S.A., hereby certifies that "Plaintiff's First Amended Complaint" was filed electronically with the Clerk of Court using the CM/ECF system on November 27, 2013, which will automatically send e-mail notification of such filing to all attorneys of record.

　　　　　　　　　　　　　　　　　　　　　　　　　　／s／ Jennifer L. Ilkka